JOSEPH N. CASAS, SBN 225800
The Law Offices of Joseph N. Casas, PC
11440 W Bernardo Court, Suite 300
San Diego, CA  92127-1644

9602 Antoine Forest Drive
San Antonio, Texas 78254

Telephone: 210-201-0494
E-mail: joseph@casaslaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS (SAN ANTONIO DIVISION)

| | |
|---|---|
| PATRICIA GARCIA,<br>NICKOLAS RAPLEY,<br>SAM SMARGON,<br>FRANKLIN DANIEL FERNANDEZ, and<br>ATOUSA MONJAZEB,<br><br>          Plaintiffs,<br><br>vs.<br><br>BIOLUSTRÉ, INC., a Texas corporation;<br>LEONARD BUCHANAN, an individual;<br>ESTHER MATA, an individual; and<br>MICHAEL MATA, an individual, and Does 1-10<br><br>          Defendants. | Case No. 5:12-cv-00557<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS AND COMMON LAW FRAUD, DECEIT AND MISREPRESENTATION**<br><br>(JURY TRIAL DEMANDED) |

**GENERAL ALLEGATIONS**

Plaintiffs Patricia Ann Garcia ("Garcia"), Nickolas Rapley ("Rapley"), Sam Smargon ("Smargon"), Franklin Daniel Fernandez ("Fernandez"), and Atousa Monjazeb ("Monjazeb") (collectively referred to as "Plaintiffs") complain as follows:

1       1.      Defendant Biolustré, Inc., is a Texas corporation with its principal place of business

2   in San Antonio, Texas ("Biolustré").   According to its Private Placement Memorandum ("PPM"),

3   Biolustré is a manufacturing and marketing company dedicated to providing the hair industry, and

4   ultimately the end user, with a unique, patented technology that repairs hair.  Biolustré boasts that

5   its product restores hair back to a "near virgin state no matter how damaged the hair (from

6   coloring, straightening and even chemotherapy)."

7       2.      Defendants Leonard Buchanan ("Buchanan"), Esther Mata[1], and Michael Troy

8   Mata ("Mata") are individuals.  Plaintiffs are informed and believe that each resides and transacts

9   affairs from San Antonio, Texas throughout the United States, including but not limited to the

10  State of California. At all times mentioned, Mata was Biolustré's Chief Executive Officer and

11  Buchanan its Chief Operating Officer. At all times mentioned Mata and Buchanan controlled

12  Biolustré under Title 15, United States Code §§ 77o(a) and 78t(a) and acted in the course and

13  scope of employment.  Defendant Biolustré and Defendants Esther Mata, Michael Mata, and

14  Leonard Buchanan (including Does 1-10) are collectively referred to as "Defendants."

15      3.      According to Biolustré's PPM, Michael Mata "is involved in every aspect of the

16  day-to-day business of Biolustré.  He has over ten years of business experience and was a

17  candidate for the United States Senate in 1994.  Prior experience includes ownership of various

18  businesses."

19      4.      The PPM states that "Buchanan is the founder of BusinessMaster.com, an internet

20  company specializing in e-commerce and business applications. Mr. Buchanan was also Director

21  of Operations of Orbis-Online, a reverse auctions procurement company with earnings of $30

22  million per year. Mr. Buchanan also co-founded Bauhaus MediaCompany, San Antonio's third

23  largest video post-production company."

24      5.      Plaintiffs are individuals.  Garcia and Monjazeb reside in San Diego, California.

25  Fernandez resides in Lafayette, California. Smargon resides in Chula Vista, California. Plaintiff

26

27  [1] Defendant Esther Mata will be referred to by her complete name throughout the Complaint.
    Defendant Michael Mata will be referred to as Mata.

28

Rapley resides in Philadelphia, Pennsylvania.  Garcia, Rapley, and Fernandez are veterans with distinguished military service as officers in the United States Navy.  Garcia is a retired Naval Officer with 22 years of service with a last rank of Lieutenant Commander.  Rapley is a Naval Officer with 19 years of service, and Fernandez is a Naval Officer with 18 years of service.

6.     This court has jurisdiction pursuant to Section22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77v(a), and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78aa, Title 28 § 1331, 1332, and 1367(a)  Defendants have, directly or indirectly made use of the means of instrumentalities of interstate commerce, of the mails, in connection with the transactions, acts, practices and courses of business alleged in the complaint.

7.     Venue in this court is proper under Section 22(a) of the Securities Act, 15. U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 15 United States Code § 77v(a), 78aa, 28 U.S.C. §1391(b)(1) and (2) and 18 U.S.C. § 1965 (a)(b) and (d), because the defendants reside and conduct business in the district and because certain of the transactions, acts, practices, and courses of conduct constituting violations of federal securities laws, among other federal laws, occurred within this district.  Finally, all of the Defendants participated in the wrongs complained of, and therefore proper venue as to one Defendant is proper venue as to all Defendants.

**SUMMARY**

8.     This case involves an ongoing fraudulent scheme (and potentially a Ponzi scheme) concerning the fraudulent offer and sale of approximately $195,000 of securities in Biolustré by Biolustré, Michael and Esther Mata and Buchannan and potentially other Biolustré agents.  From 2011 through the filing of this complaint, Defendants have misrepresented and failed to disclose to Plaintiffs material information regarding, *inter alia:* a) the use of Plaintiffs' investments; b) investor returns; c) the preservation of investor capital; and d) the purported public offering of Biolustré shares.

9.     Through a series of phone conversations, SMS messages ("Texts", e-mails, and various purported agreements, Defendants coerced, misrepresented, lied to, and convinced

Plaintiffs to "invest" their money in Biolustré in exchange for Biolustré stock ("Biolustré Stock"). Defendants' promised that Plaintiffs investments would yield substantial returns because they would be purchasing Biolustré stock as a "pre-IPO" (pre-Initial Public Offering, hereinafter referred to as "IPO").

10.     In order to persuade Plaintiffs that their investment was sound, Defendants guaranteed their investment through a purported "Surety Bond" or "Short Term Debt Equity Agreement".  According to the terms of the "Surety Bond", Plaintiffs were granted a "bond" in a certain principal amount, plus twelve percent (12%) payable in ninety (90) days from the date of Biolustré's stock "goes public", unless the investor, at his/her sole discretion, converts the instrument into shares in Biolustré.   Similarly, Defendants promised at least one Plaintiff (Garcia) the return of a portion of her investment (artfully termed as a "loan") through a purported Short Term Debt Equity Agreement.

11.     To further persuade Plaintiffs to become involved in the Biolustré investment and to persuade other individuals in investing in Biolustré, Defendants promised Plaintiffs they would receive a commission for any funds received from investors who were referred by Plaintiffs.

12.     In almost every instance, Plaintiffs were told they would receive a Surety Bond and/or the Short Term Debt Equity Agreement.  By sending Plaintiffs these "agreements" Defendants sought to gain, and did gain, the trust of Plaintiffs. Defendants convinced Plaintiffs that their investments were secure and/or that their investments would yield profitable returns. However, after Biolustré's receipt of the signed agreements, Biolustré, *vis a vis* Mata and Buchanan, refused to sign or intentionally failed to the purported agreements.  It is unclear how the Surety Bonds actual secure Plaintiffs' investments and/or by what third-party surety company the Surety Bond is backed.

13.     By engaging in the conduct described in this complaint, the Defendants have violated, and unless enjoined, will continue to violate *inter alia*, Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  In

view of the serious and ongoing nature of the violations, Plaintiffs seek a temporary restraining order, preliminary and permanent injunctions, disgorgement/rescission plus interest, accountings, an order prohibiting the destruction of documents (including electronic data), an order expediting discovery against all Defendants and civil penalties against Defendants.  Plaintiffs also seek an asset freeze and an appointment of a receiver over Biolustré.

## THE OFFERING

14.     According to the terms of Biolustre's Private Placement Memorandum ("PPM"), Biolustré's offering was for a maximum of 666,667 common shares at $ 0.75 per share with a minimum subscription of $5,000 and a maximum subscription of $500,000 (the "Offering").   The "estimated" uses of the Offering are to "i) fund the manufacturing in conjunction with the roll-out of the U.S. salon distribution campaign, ii) hire personnel to support the new distributors in getting the product out to salons and iii) for working capital and general corporate purposes."

15.     Biolustré claims "[t]he Company is debt-free and has historically used its equity capital and internally generated cash flow for R&D, product development and marketing, including a 30 minute infomercial, a two-minute commercial and a 60-second commercial."

## THE FRAUDULENT SCHEME

16.     On or about January 2011, a family connection informed Mata how well his cousin, Garcia, had done in the United States Navy.  After learning this information, Mata began to seek out Garcia, playing on his family connection with her (though he was never really close to her prior to this) to gain her trust and attention.  Within a few weeks of this initial contact, Mata began a series of overtures via phone, e-mail, and text messages, to lull Garcia into purchasing a certain amount of purported Biolustré Stock.   In order to gain the confidence of Garcia, he used his familial relationship (as her cousin) and assured Garcia that her investment would be returned to her in its entirety.  To further convince Garcia of the security in the Biolustré investment, Mata told Garcia that she should buy stock of Biolustré because the company planned an IPO sometime "in the second quarter of 2011".

17.     On May 26, 2011, defendant Mata emailed Garcia a March 2011 Overview of

Biolustré and a PPM offering shares at $0.75 each, with a minimum purchase of $5,000. On that same day, Mata informed Garcia, via e-mail, that persons who invested more than $100,000 would pay only $0.50 a share.  Mata boasted about the investment's security by further informing Garcia that people who invested more than $100,000 would receive a "Stock-Option Buy-Back Agreement." Under the Stock-Option Buy-Back Agreement, if Biolustré Stock did not obtain a price of $1.00 following the initial public offering, the investor could elect to resell all but $10,000 back to Biolustré at $0.50 each.  Specifically, Mata wrote the following to Garcia in the May 26, 2011 e-mail:

> The pre-IPO share price for Biolustre, Inc. is .75c per share.  But at 100k, the share price is .50c per share and investors get a stock option buy-back provision ( see attached ).  That means that if shares do not open at $1.00 per share at the IPO, the company will buy back shares at .50c per share.
>
> Our opening share price is projected to reach $2 - 2.50 per share given 1) the pending Legislation requiring every stylist in Texas to carry our product, like a fire extinguisher for damaged hair and  2) the launch of our new formaldehyde-free Brazilian Blowout alternative we call REVAMP.

18.     On May 26, 2011, Mata also e-mailed Garcia the name and banking information for BBVA Compass Bank, which acted as transfer agent.  On that same day, Garcia wired the first $3,000 from her bank in California to Defendants' bank account held by BBVA Compass Bank ("BBVA").

19.     On or about May 2011, Mata offered to issue to Garcia a "surety bond" under which it promised to pay the amount invested plus 12% within 90 days, unless she decided to retain the shares.  Between May 2011 and October 2011, Mata engaged in an onslaught of e-mails, texts, and phone calls to Garcia in an attempt to convince her of the worthiness of Biolustré, the security of the investment, and promises of a public offering.  By October 2011, prior to Garcia's largest monetary infusion into Biolustré, Mata assured Garcia that Biolustré IPO would occur by December 2011.

20.     On July 18, 2011, in reliance of Defendants assurances and statement made orally by Mata, as well as through text(s), and/or through e-mail(s) from the State of Texas to the State

of California, Garcia mailed to BBVA a check for $5,000. On October 28, 2011, Garcia wired to BBVA $140,000. Prior to wiring the $140,000, Garcia informed Mata that Garcia had obtained these funds through a loan by refinancing her home. Garcia specifically informed Mata that the $140,000 loan was to be used as a down payment on a new home. Garcia would never have invested the $140,000, but for Mata's misrepresentations that Biolustré would go public within a few short weeks of wiring the money and in reliance of both the Stock-Option Buy-Back Agreement and the Surety Bond. To further highlight the importance of receiving her investment back as promised by Mata, Garcia specifically informed Mata that she had recently been laid off and could only rely on the loan to make the mortgage deposit. Mata assured Garcia she would get her money back before closing on her new home. On October 27, 2011, Biolustré issued to Garcia a certificate for 500,000 shares of Biolustré Stock. On October 28, 2011, Biolustré issued to Garcia a "Surety Bond" for $153,000, executed by defendant Buchanan.

21.    On November 11, 2011, Garcia, with Mata's encouragement, forwarded, by e-mail, to plaintiff Monjazeb the information she received from Mata. Plaintiff Monjazeb e-mailed the material to plaintiff Smargon.

22.    On November 18, 2011, Mata spoke by telephone with Monjazeb. During that conversation, he told her that she could invest $5,000 and Smargon could invest $15,000 at $0.30 (a price per share inconsistent with the price offered in the PPM) a share as long as they wired the money that day.

23.    Smargon held multiple conversations with Mata and Buchanan prior to wiring his investment funds to Biolustré. Mata and Buchanan promised that Biolustré would "go public" within weeks of him wiring the money to Biolustré. Mata and Buchanan urged Smargon to wire the money immediately in order to take advantage of the "pre-IPO" offering. By doing so, Mata and Buchanan promised Smargon that he would be able to sell enough of his shares to get a full return on his investment plus 25% profit and still keep enough of his investment in Biolustré.

24.    On that same day, pursuant to instructions by Defendants, Monjazeb wired BBVA $5,000 and Smargon wired BBVA $15,000, for the purchase of Biolustré Stock.

25.     On December 1, 2011, plaintiff Garcia wired BBVA an additional $10,000 for the purchase of Biolustré Stock.  Mata convinced Garcia to wire this additional money under my her mother's name (Tina G. Arrington) even though, according to Mata, she had maxed out the limit on her personal investment in Biolustré.  He convinced Garcia to expedite the $10,000 because Biolustré's IPO would occur within a few short weeks.  Mata promised Garcia would receive a stock certificate under my mother's name along with a Surety Bond.  Garcia never received either a stock certificate or a Surety Bond.  According to Mata, he wanted Garcia to wait to send her mother's stock certificate in case Garcia had more "finder's fees" coming to her.  In February 2012, Garcia held a conversation with Buchanan who informed her that the $10,000 she wired upon Mata's instructions was never received by Biolustré.

26.     In December 2011 defendant Mata reneged on his original representations to Garcia and told Garcia in a telephone conversation that Biolustré now planned the initial public offering for mid- to late-January 2012 and that it would occur "no later than" February 2012. Mata told her that it had not happened in December 2011 originally planned because the "company was waiting for a $5 million investment to go into escrow." He further told her that the investment had been made but that the holiday season was not a good time for an initial public offering.  The new IPO date, according to Mata, was now February 27, 2012.  Mata was aware, as Garcia specifically informed him, that any representations made to her about Plaintiffs' investments was relayed by Garcia to all other Plaintiffs.

27.     At this point, Garcia began to get very suspicious about what Mata was telling her.  Garcia told Mata that she wanted a new surety bond agreement.  On December 20, 2011, she received by email an unsigned surety bond under which she had 90 days after the stock's initial public offering to redeem her shares for the amount she paid plus 12%.

28.     Mata had similar conversations with Fernandez and ensured him that his investment would be safe, especially with a surety bond issued by Biolustré.   On December 22, 2011, Mata emailed Fernandez an unsigned form surety bond payable to Fernandez.

29.     On that same day, Plaintiffs Fernandez, Rapley, and Garcia held a telephone

conversation with defendant Mata in which they agreed that Fernandez would wire the bank $10,000 for 33,000 shares of Biolustré Stock, half of which would be issued to him and half to Rapley. As with Garcia, Mata again told Fernandez and Rapley that their investments were secure and promised to issue them a surety bond to "protect" their investments.

30.     On that same day, on reliance of Mata's representations, Fernandez wired Biolustré $10,000 for the purchase of Biolustré Stock.

31.     On January 23, 2012, Mata emailed Garcia a signed revised Surety Bond. The following day, he sent her a signed, notarized, revised Surety Bond.

32.     Biolustré's, Mata's and Buchanan's statements to Plaintiffs that Biolustré planned a public offering for the first quarter of 2011, for December 2011, or for January or February 2012 were patently false.  It is evident that Biolustré never had plans for a public offering and instead used the promise of "going public" to convince Plaintiffs to invest in Biolustré.  If Biolustré did have plans to issue a public offering, Defendants misrepresented the facts surrounding the purported public offering in order to gain the trust of Plaintiffs and eventually Plaintiffs money.

33.     Because Biolustré had no intention of a public offering, plaintiffs paid more for their shares than they were worth and indeed invested in a company they would not have invested in, but for Defendants representations.

34.     On one particular occasion, Plaintiff Smargon contacted Buchanan directly to find out what was going on with their investments into Biolustré and why they had not received their money back after multiple requests for the same.   Buchanan responded that the Biolustré Board of Directors would rectify Plaintiffs' situation "with a solution that would make everyone happy."  Buchanan never responded with the purported "solution."

35.     A review of Biolustré, Mata's, and Buchanan's history reveals a pattern of deceit, lies, and theft throughout the United States.   On May 9, 2005, Biolustré, by and through its Officers, Directors, Employees, Affiliates, Agents and Assigns, including Buchanan and Mata are prohibited from offering or selling securities in the State of Illinois.   Plaintiffs are informed and believe that Biolustré (and/or Mata/Buchanan) may be similarly barred from selling securities in

other states.

36.     Sometime in late January 2012, Mata called Garcia persuade me to invest more money.  He seemed eager and insistent that Garcia invest more money to "lock" great share prices in.  By this point, Garcia was very hesitant and told him that she needed more assurances from Mata.  He told me that whatever else she could invest would be backed by a Short Term Debt Equity Agreement.   Garcia told Mata that she could invest $7,500 more and no more, but that the $7,500 could be returned to her in its entirety within 10 days of wiring him the money.  Mata agreed and promptly sent Garcia a Short Term Debt Equity Agreement.   Garcia told her to sign the agreement and that he would fill out the information (including the monetary amount), and have it notarized.  Garcia signed the  Short Term Debt Equity Agreement on February 2, 2012. Mata never returned or executed the Short Term Debt Equity Agreement.

37.     On February 3, 2012, Garcia wired $7,500 pursuant to Mata's instructions and assurances.

38.     In total, Plaintiffs invested $195,500.00.  Garcia invested $165,500; Smargon invested $15,000; Monjazeb invested $5,000; Fernandez invested $5,000, and Rapley invested $5,000.

39.     Due to Defendants' lies and misrepresentations, Garcia was forced to take out an additional $150,000 loan to complete the closing of her property.  As a result, the loan she took out to buy her house is $150,000 larger than it would have been, making the monthly mortgage over $3000 - an amount she cannot sustain on her fixed income.  Her mortgage payments commenced on March 1, 2012 and without repayment of the money she used for the Biolustré investment (as promised by Mata), she will imminently be unable to afford her multiple bank loans and will risk losing her homes.  Garcia has had to put over $50,000 on credit cards to help her make ends meet.  She has also been forced to borrow money from my mother and has had to use her tax refund to cover day-to-day bills.  In addition to the financing that Garcia took out as a result of Defendants' wrongdoing, she has been forced to borrow over $75,000 (from her mother and credit cards) to cover her expenses.  These funds will soon be exhausted and the money lent to

me will need to be paid back.   Without repayment of the money she invested in Biolustré, she will likely lose her homes and her credit will be ruined.    Garcia is on the brink of bankruptcy.

40.     As of the date of the filing of this complaint, Plaintiffs have not received any amount of their funds back from Defendants despite multiple requests.

41.     Plaintiffs demand rescission of their purchases of shares. They tender their shares to Biolustré and demand return of the consideration they paid, in addition to attorney's fees and costs.

## ASSET DISSIPATION AND ONGOING FRAUD

42.     Based on the current information available, it appears Defendants have been engaging in fraudulent conduct at worst, and securities violations at a minimum, since at least May 2005.  Based on Defendants past conduct and the current allegations in this complaint, there is a reasonable likelihood that the Defendants' fraudulent conduct will continue if not enjoined.

43.     If Defendants are not immediately stopped, there is a serious risk that they will continue to dissipate Plaintiffs assets in Biolustré and continue to cause harm to the public at large. Defendants have been using and will probably continue using new investors' capital to pay returns on other investments.  It is likely that Defendants have used or will be using Plaintiffs capital to pay other investors and/or operating expenses.  Defendants have failed and will probably continue to fail to keep accurate books and records reflecting the true state of affairs.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### Violations of Section 17(a) of the Securities Act

44.     Plaintiffs reallege and incorporate paragraphs 1 through 43 above.

45.     Defendants Biolustré, Leonard Buchanan, Esther Mata, and Michael Mata, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use or means of instruments of transportation or communication in interstate commerce or by use of the mails:

a. with scienter, employed devices, schemes, or artifaces to defraud;

b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in transaction, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

46.     Defendants knew that the representations of Biolustré's plans for a public offering were false.  Defendants had no intentions for a public offering and even if they did, they misrepresented the accuracy of said public offerings and used the promise of a date-certain for said public offerings(s) to induce Plaintiffs to buy shares of Biolustré.

47.     Defendants made further representations to Plaintiffs by offering a purported "Surety Bond" or "Short Term Debt Equity Agreement" in order to give Plaintiffs a false sense of security that their investment was guaranteed and/or protected should they change their mind after making the investments into Biolustré.

48.     Plaintiffs bought shares in Biolustré in reliance on Defendants' statements that Biolustré planned to offer shares to the public. Had Plaintiffs known the true facts, they would not have bought the shares.

49.     By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### Violations of Section 10(b) or the Exchange Act and Rule 10b-5 thereunder

50.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 49 above.

51.     Defendants Biolustré, Leonard Buchanan, Esther Mata, and Michael Mata, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or

sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.   employed devices, schemes, or artifaces to defraud;

      b.   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

52.      By engaging in the conduct described above, each of the Defendants violated, and unless restrained or enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF
### Violation of Section 20(a) of The Exchange Act Against Defendants Mata and Buchanan

53.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 52 above.

54.   This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against Defendants Michael Mata and Lenard Buchanan.

55.   Mata and Buchanan controlled Biolustré within the meaning of Section 20(a) of the Exchange Act.  Mata and Buchanan were each a director and executive officer of Biolustré.  Mata is the Chief Executive Officer and Buchanan is the Chief Financial Officer.   By virtue of their high level positions with Biolustré, their participation in the negotiation of the sale of Biolustré shares to Plaintiffs, and their participation in the PPM, Prospectus, or any other literature and/or communication disseminated to Plaintiffs associated with the sale of Biolustré shares, these Defendants had the power to influence, and control, and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the documents which Plaintiffs contend are false and misleading.

56.   During the relevant time period, Defendants Mata and Buchanan each had knowledge of or reasonable ground to believe that the Biolustré's PPM, Prospectus, and/or any other literature

and/or written communications, associated with the Biolustré Stock, contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements not misleading.  Each of these Defendants had knowledge of, or reasonable ground to believe in, the existence of facts which made Biolustré's PPM, Prospectus and/or any other literature and/or written communications, associated with the Biolustré Stock false and misleading.

57.    At the time Plaintiffs purchased the Biolustré shares, they did not know of any of the false and/or misleading statements and omissions, and relied upon the representations by Mata and Buchanan.

58.    As a direct and proximate result of the wrongful conduct by these Defendants, Plaintiffs suffered damages.

59.    By virtue of their positions as controlling persons, Defendants Mata and Buchanan are liable pursuant to Section 20(a) of the Exchange Act.

## FOURTH CLAIM FOR RELIEF COMMON LAW FRAUD, DECEIT AND MISREPRESENTATION AGAINST DEFENDANTS

60.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 above.

61.    This Claim is brought under common law fraud, deceit, and misrepresentation against all Defendants.

62.    Defendants were responsible for providing financial data and information in Biolustré's PPM, Prospectus and/or any other literature and/or written communications, associated with and related to the Biolustré Stock.

63.    Those documents and oral representations contained untrue statements of material fact and/or omitted material facts required to be stated therein to make those statements and prospectuses not misleading, including but not limited to:

- The historical and financial status of Biolustré and management discussions thereof;
- The viability of Biolustré's products and expected growth of the company;
- Defendant Mata and Buchanan's experience in business and finance;
- How Plaintiffs' investments would be used;

- How Plaintiffs' capitals would be secured and/or "bonded" through either a "Surety Bond" or "Short Term Debt Equity Agreement";

- That through the Surety Bond; Plaintiffs were granted a bond in a certain principal amount, plus twelve percent (12%) payable in ninety (90) days from the date of Biolustré's stock "going public", unless the Plaintiff, at his/her <u>sole</u> discretion, converted the instrument into shares in Biolustré.

- That Plaintiffs investments would yield substantial returns because they were purchasing Biolustré stock as a "pre-IPO");

- The preservation of Plaintiffs' capital; and

- That Biolustré would issue an initial public offering, first in "the second quarter of 2011," then in December 2011, then in "mid-to-late January 2012; then "no later than February 2012."

- That Plaintiff Garcia would receive a return of her full investment within a few short weeks of wiring the money or words to that effect, and would receive the return of her full investment before closing on her new home, or words to that effect.

- That investors who invested more than $100,000 under the Stock-Option Buy-Back Agreement, could elect to resell all but $10,000 back to Biolustré at $0.50 each if Biolustré Stock did not obtain a price of $1.00 following the initial public offering.

- That Plaintiffs' were issued Biolustré shares in exchange for their monetary investments.

- That Plaintiffs' were able to purchase Biolustré shares at various prices (inconsistent with other similarly situated investors) as a result of their "pre-IPO" status.

- That the December 2011 public offering was delayed because "the company was waiting for a $5 million investment to go into escrow."

- That the IPO would occur on February 27, 2012.

64.    Defendants knew the information above, and as alleged in this complaint, provided to Plaintiffs was false and misleading, and omitted information necessary to make the statements therein not misleading.

65.    Defendants knew that Plaintiffs would use the information provided to them in making their decision to invest in Biolustré.

66.    Plaintiffs relied on the materially false and misleading statements of the Defendants in wiring funds to Biolustré and purchasing Biolustré shares. In particular, Plaintiffs relied on Biolustré's PPM, Prospectus and/or any other literature and/or written communications, associated with and related to the Biolustré Stock contained in and made part of those documents.

67.    At the time Plaintiffs purchased the Biolustré shares, they did not know of any of the false and/or misleading statements and omissions, and relied upon the representations made by the Defendants.

68.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Biolustré shares and thereby proximately cause Plaintiffs to suffer damages.

## JURY DEMAND

69.    Plaintiffs demand a trial by jury on all issues.

WHEREFORE, Plaintiffs pray judgment as follows:

(1) Rescission of their purchases of their shares and restoration of the consideration given for them;

(2) Compensatory damages;

(3) Consequential damages in an amount to be determined at trial;

(4) Punitive damages in an amount to be determined at trial;

(5) Prejudgment interest

(6) Costs of this action, including attorneys' fees and experts' fees; and

(7) Such other relief as the Court may deem just and proper.


Dated: June 4, 2012                           Respectfully submitted,
                                              THE LAW OFFICES OF JOSEPH N. CASAS, P.C.


                                              /s/ Joseph N. Casas
                                              JOSEPH N. CASAS
                                              Attorneys for Plaintiffs